FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 04, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

|  |  |
|---|---|
| HOBAN & ASSOCIATES, LLC a Washington Limited Liability Company d/b/a COAST PROPERTY MANAGEMENT, COAST SCREENING SERVICES, COAST COLLECTION SERVICES, COAST MANAGEMENT COMPANY, INC. (CMC); and CANYON BLUFFS INVESTORS VII-1, LLC, a Washington limited liability company,<br><br>                    Plaintiffs,<br><br>     v.<br><br>REALPAGE, INC., a foreign corporation; and RP ON-SITE LLC, a foreign corporation,<br><br>                    Defendants. | NO. 2:24-CV-0155-TOR<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS |

BEFORE THE COURT is Defendants' Real Page, Inc. and RP On-Site LLC

Motion for Judgment on the Pleadings (ECF No. 12).  This matter was submitted

for consideration without oral argument. The Court has reviewed the record and

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE
PLEADINGS ~ 1

files herein and is fully informed.  For the reasons discussed below, Defendants'

Real Page, Inc. and RP On-Site LLC Motion for Judgment on the Pleadings (ECF

No. 12) is GRANTED.

## BACKGROUND

This matter arises out of an underlying class action lawsuit surrounding

Third-Party Plaintiffs' alleged failure to comply with relevant Washington State

residential landlord-tenant law.  Third-Party Plaintiffs Hoban & Associates, LLC,

d/b/a Coast Property Manager, Coast Screening Services, Coast Collection

Services, Coast Management Company, Inc., and Canyon Bluffs Investors VII-1,

LLC, (collectively "Coast") provide property management services for residential

properties in Washington state.  ECF No. 2 at 63, ¶ 30.  On February 3, 2023,

Spokane County Superior Court certified a class against Coast encompassing

prospective tenants who had not been provided with relevant disclosures pursuant

to RCW 59.18.030(16) between April 28, 2017, and February 10, 2023.  *Id*. at 21.

Thereafter, Coast brought a Third-Party Complaint against RealPage, Inc.

("RealPage") and RP On-Site LLC ("RP On-Site") on September 20, 2023, and

later amended the Third-Party Complaint on January 29, 2024.  *Id*. at 47, 58.

RealPage and RP On-Site are the entities allegedly involved with providing

prospective tenant screenings to Coast.  *Id*. at 53, ¶ 8.  RP On-Site is a subsidiary

of RealPage, Inc.  *Id*. at 52, ¶ 4.

Pursuant to the Service Agreement, signed in November 2013, RP On-Site agreed to provide Coast with consumer credit information for the purpose of preparing and furnishing consumer reports.[1]  *Id*. at 42, ¶¶ 9,11.  Relevant to this dispute, the 2013 Service Agreement contains an indemnification clause stating:

> Client agrees to indemnify and hold harmless OSM, its directors, officers, employees, agents, subsidiaries, members, parents and affiliates, against any and all liability, loss, claims demands, damages or costs of any kind, including reasonable attorneys' fees and costs of litigation, resulting from the use of the Services, breach of this Agreement, or violation of any statute, by Client or its employees, agents, independent contractors, or affiliates.

ECF No. 12-1 at 4.

The Service Agreement also contained a limitation of liability:

> In no event will OSM be liable to client or to any of client's customers or third parties for any indirect, incidental, consequential or special damages (including but not limited to damages to business reputation, lost business or lost profits), whether foreseeable or not and however caused, even if Experian is advised of the possibility of such damages . . .

The Service Agreement disclaimed any warranty on the provided reports

---

[1] RP On-Site acquired the assets On-Site Manager, Inc. ("OSM"), the original entity that entered into the Service Agreement with Coast.  ECF No. 2 at 53, ¶ 10. RP On-Site performs services for Coast pursuant to the November 2013 Service Agreement.  *Id*.

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS ~ 3

pursuant to the agreement, stating that such services are offered "as is," and without any warranty regarding quality, suitability, and merchantability. *Id*. at 4–5. And the agreement states that it will be the client's sole responsibility to, "ensure it is in full compliance with applicable laws and all of OSM's policies and procedures before requesting or using any consumer report information." *Id*. at 8. A signatory to the agreement agrees to hold RP On-Site harmless in the use of the screening service. *Id*.

Members of the putative class, including the named Plaintiff in the underlying matter, applied for Coast managed properties using RP On-Site's online portal. ECF No. 2 at 53, ¶ 12. In the Amended Third-Party Complaint, Coast alleged that it recently discovered that RP On-Site was providing incomplete or incorrect disclosures during the application process, and thus RP On-Site and its parent company RealPage are ultimately responsible to the class of prospective tenants for the denial of rentals based on improper and incomplete disclosure. *Id*., ¶¶ 14–17. Coast brings four causes of action against RP On-Site and RealPage: violation of the Washington Consumer Protection Act, Breach of Contract, Equitable Indemnity/Contribution, and Negligence. ECF No. 2 at 54–57.

On April 12, 2024, without explanation, the Spokane County Superior Court granted RP On-Site and RealPage's Motion to Sever the Third-Party Complaint. *Id*. at 62–63. On May 10, 2024, RealPage and RP On-Site removed the matter to

1    this Court pursuant to 28 U.S.C. §§ 1332, 1441 and 1446.  ECF No. 1 at 2.

2    RealPage and RP On-Site now move for judgment on the pleadings, arguing that

3    RealPage is an improper party, the Service Agreement bars any liability that RP

4    On-Site may have, and that, even if the Service Agreement did not shield RP On-

5    Site from liability, Coast is unable to carry any of its claims.  ECF No. 12.

6                                      **DISCUSSION**

7    **I.    Judgment on the Pleadings Standard**

8              "After the pleadings are closed—but early enough not to delay trial—a party

9    may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "Analysis under

10   Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under

11   both rules, a court must determine whether the facts alleged in the complaint, taken

12   as true, entitle the plaintiff to a legal remedy."  *Chavez v. United States*, 683 F.3d

13   1102, 1108 (9th Cir. 2012) (internal quotation marks and citation omitted).  In

14   reviewing a 12(c) motion, the court "must accept all factual allegations in the

15   complaint as true and construe them in the light most favorable to the non-moving

16   party."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  However, a court

17   is not required to accept conclusory statements or legal conclusions couched as a

18   factual allegation.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A judgment on

19   the pleadings is properly granted when, taking all the allegations in the non-

20   moving party's pleadings as true, the moving party is entitled to judgment as a

matter of law." *Marshall Naify Revocable Trust v. United States*, 672 F.3d 620, 623 (9th Cir. 2012) (quoting *Fajardo v. Cty. of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999)).

As a preliminary matter, Coast argues that the Court should either disregard the supplemental materials provided by RealPage and RP On-Site or convert the motion for judgment on the pleadings into a motion for summary judgment. ECF No. 13 at 12. Pursuant to Federal Rule of Civil Procedure 12(d), when considering a Rule 12(c) motion, when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." But because a Rule 12(c) motion functions nearly identically to a Rule 12(b)(6) motion, courts may consider documents the complaint incorporates by reference and matters of which the court can take judicial notice, without converting it into a Rule 56 motion for summary judgment. *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir. 2021) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, (2007)). In deciding a Rule 12(c) motion, a court is limited to the allegations on the face of the complaint, matters which are properly judicially noticeable, and other extrinsic documents when "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document . . ." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.2005).

1    In rendering this decision, the Court reviewed the included filings from the

2    state court proceeding for the purposes of developing a foundational understanding

3    of the procedural posture of this case, but not for the truth of any facts asserted

4    therein.  *See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136

5    F.3d 1360, 1364 (9th Cir. 1998) (courts may take judicial notice of other court

6    filings as a matter of public record); *see generally* ECF No. 12.  Additionally,

7    RealPage and RP On-Site included the Service Agreement, the Terms and

8    Conditions, and an order form between Coast and RP On-Site, as attached to the

9    Motion for Judgment on the Pleadings.  ECF No. 12-1.  Review of the Service

10   Agreement and Terms and Conditions is properly considered in rendering this

11   decision because the First Amended Third Party Complaint refers to the Service

12   Agreement.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

13   The document explicitly states, "On or about November 20, 2013, Coast entered

14   into a Service Agreement (*sic* Service Agreement") with On-Site Manager, Inc.

15   ("OSM") to provide housing and leasing screenings for Coast, including obtaining

16   consumer reports for perspective tenants for Coast's Washington properties."  ECF

17   No. 2 at 53, ¶ 9.  The First Amended Complaint goes on to discuss that RP On-Site

18   purchased OSM and continued to perform services under the same Service

19   Agreement.  *Id*., ¶ 10.  Considering that the bulk of Coast's claims require review

20   of the contract it entered into with Defendants, and it does not appear that Coast

1    disputes the authenticity of the documents filed at ECF Nos. 12-1 and 12-2, the

2    Court considers the Service Agreement for its substance.

3    **II.    Enforceability of the Service Agreement**

4    RealPage and RP On-Site argue that disputed clauses contained within the

5    Service Agreement, including the indemnification and limitation of liability, bar

6    Coast's lawsuit because the parties agreed to hold RealPage and RP On-Site

7    harmless under these very conditions.  ECF No. 12 at 13–14.  Further, Coast's

8    claim of unconscionability is time barred, as the agreement was signed in 2013.  *Id*.

9    at 15.

10    A federal court sitting in diversity applies the forum state's choice-of-law

11    rules, here Washington.  *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002); *Erie*

12    *Railroad Co. v. Tompkins*, 304 U.S. 64, 58 (1938).  Washington courts have held

13    that a choice of law analysis is generally not required where parties agree to a

14    governing law by contract.  *See Brown v. MHN Gov't Servs., Inc*., 178 Wash. 2d

15    258, 263 (2013).  There appears to be no choice of law clause contained in the

16    Service Agreement, and neither party addresses the issue.  Finding no contention

17    otherwise by the parties, the Court applies Washington law.

18    First, Real Page and RP On-Site's contend that Coast's claims, including the

19    argument that portions of the Service agreement be voided on grounds of

20    substantive unconscionability, should be dismissed because claims deriving from

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE
PLEADINGS ~ 8

the contract are time barred.  ECF No. 12 at 15.  Washington employs a six-year statute of limitation on written contracts.  RCW 4.16.040(1).  This statutory period of the contract begins to run upon breach.  *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wash. 2d 566, 578 (2006), *as corrected* (Nov. 15, 2006).  However, other courts have enforced an even stricter standard against parties seeking to invoke unconscionability related to contract claims, finding the time begins to run when discovery of the contract provision should have occurred, rather than the breach.  *Zappala v. Port of Seattle*, 12 Wash. App. 2d 1019 (2020) (declining to extend the statute of limitation where a party attempted to characterize their procedural unconscionability claim as an affirmative defense twenty years after the contract had been signed); *Potter v. Am.'s Servicing Co.*, No. C13-1129RAJ, 2014 WL 3694247, at *3 (W.D. Wash. July 23, 2014) ("[Plaintiff's] claim that the original loan was substantively unconscionable is subject to a six-year statute of limitations, RCW 4.16.040(1), but it accrued the moment she entered the loan.").  Here, Coast has been operating under the Service Agreement since 2013, and only just discovered the defect upon investigating the class action lawsuit against it, alleging the breach likely happened in 2017.  ECF No. 13 at 7.  While on the one hand, parties were aware of the allegedly unconscionable terms of the Service Agreement when they signed the document in 2013, Washington law suggests that the breach of contract is the turning point for the six-year limit for Coast's claim.

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS ~ 9

Even still, these claims are likely time barred as the first instance of the activity that Coast alleges constitutes breach happened in April 2017. ECF No. 2 at 76. As Coast points out, the statutory period for contract claims begins running when the breach occurs, not when reasonable diligence would have uncovered the defect. *See 1000 Virginia Ltd. P'ship,* 158 Wash. 2d at 576 (finding that outside of construction contracts, the statute of limitation for contract claims begins to run when the breach occurs); *see also Kinney v. Cook*, 150 Wash. App. 187, 193 (2009) ("Here, the Kinneys apparently seek to extend the rule announced in *1000 Virginia Limited Partnership* beyond the construction contract context. This we decline to do . . . Here, the alleged breach occurred in January 2000 when Mr. Cook engineered the corporation's guarantee of the $4.5 million loan from Mercedes–Benz; this suit was filed on August 1, 2007, after the six-year statute of limitations had run."). The Third-Party action was filed in September 2023, outside of the relevant statutory period.

Additionally, Washington Consumer Protection Act claims are subject to a four-year statute of limitation under RCW 19.86.120, and such claims begin to run when a party "through the exercise of due diligence, knew or should have known the basis for the cause of action." *Shepard v. Holmes*, 185 Wash. App. 730, 739 (2014) (quoting *Green v. Am. Pharm. Co*., 86 Wash.App. 63, 66 (1997), *aff'd*, 136 Wash.2d 87 (1998)); *see also Schilling v. ProBuild Co*., LLC, 3 Wash. App. 2d

1052 (2018) ("The discovery rule, an exception to the general rule of accrual, can

apply to CPA claims."). Coast could have reasonably discovered the contractual

defects for purposes of the WCPA upon signature in 2013, upon breach in 2017, or

during the investigation in 2023, and therefore a question remains as to whether

this claim is time barred.

However, the Court need not decide whether the applicable statute of

limitations have run, as it finds that the relevant provisions shielding RealPage and

RP On-Site from liability enforceable under Washington law. Unconscionability is

a question of law. *Nelson v. McGoldrick*, 127 Wash.2d 124, 131 (1995) (citing

*Mieske v. Bartell Drug Co*., 92 Wash.2d 40, 50 (1979)). Generally, Washington

courts interpret contracts to ascertain the intent of the parties involved. *Berg v.

Hudesman*, 115 Wash. 2d 657, 663 (1990). At issue in the present matter,

indemnity agreements are treated like any other contract. *Jones v. Strom Constr.

Co*., 84 Wash.2d 518, 520 (1974). Washington has recognized a distinction

between indemnity clauses and exculpatory clauses, but has ultimately determined

that both types of clauses achieve the same end: shifting the burden of

responsibility from the negligent party to an injured party. *Scott By & Through

Scott v. Pac. W. Mountain Resort*, 119 Wash. 2d 484, 490 (1992) (internal citation

omitted). Courts have enforced indemnity clauses, including those which

indemnify a party's own negligence, when the clause contains specific language

1    that is used to evidence a clean and unequivocal intention to indemnify the

2    indemnitee's own negligence.  *Nw. Airlines v. Hughes Air Corp.*, 104 Wash. 2d

3    152, 155 (1985) (collecting cases); *see also McDowell v. Austin Co.*, 105 Wash. 2d

4    48, 54 (1985).  Further, in commercial transactions, exculpatory clauses are prima

5    facie conscionable.  *Schroeder v. Fageol Motors, Inc.*, 86 Wash.2d 256, 262–63

6    (1975).  Clauses holding the indemnitee harmless or otherwise limiting liability

7    have been found enforceable provided the expressed terms set forth therein are

8    conveyed with clear intent.  *Scott By & Through Scott*, 119 Wash. at 491–92 ("We

9    conclude that to the extent the release is otherwise legally valid the language of the

10   exculpatory clause was sufficiently clear to release the ski school from liability for

11   negligent conduct.").

12       Here, the indemnity clause states, "[c]lient agrees to indemnify and hold

13   harmless OSM . .  parents and affiliates, against any and all liability, loss, claims,

14   demands, damages or costs of any kind, including reasonable attorneys' fees and

15   costs of litigation, resulting from the use of the Services, breach of this Agreement,

16   or violation of any statute . . ."  ECF No. 12-1 at 4.  This is an express statement of

17   indemnification, by which Coast agreed, beginning in 2013, to indemnify RP On-

18   Site and *its parent* against any and all liability.

19       Moving next to the "hold harmless," phrase within the indemnity provision,

20   and more general limitation on liability section, the Court also finds these are not

voided as unconscionable. "In consumer sales transactions, intervention is warranted to counteract the inherent inequality of bargaining power and the resultant inequities. Parties to a commercial contract, however, generally have equal bargaining power and an equal ability to seek advice and alternative offers." *Am. Nursery Prod., Inc. v. Indian Wells Orchards*, 115 Wash. 2d 217, 224 (1990); *see also Chauvlier v Booth Creek Ski Holdings*, 109 Wash. App. 334, 339–40 (2001) ("Exculpatory provisions are strictly construed under Washington law and are enforceable only if their language is sufficiently clear."). In a commercial transaction without a claim of unfair surprise surrounding the contract itself, the onus is on the party seeking to invalidate the clause to show (1) the conspicuousness of the clause in the agreement; (2) the presence or absence of negotiations regarding the clause; (3) the custom and usage of the trade; and (4) any policy developed between the parties during the course of dealing. *Schroeder*, 96 Wash.2d at 259–61. Further, courts will consider the totality of the circumstances of the contract itself, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print. *Am. Nursery Prod., Inc.,* 115 Wash. 2d at 222.

The Court finds the *Schroeder* test applicable to this commercial transaction, as an unfair surprise usually lends itself to situations where the contract contains

areas of fine print, is particularly long, the terms change over time, or were not

presented to the relevant individuals against whom the contract will be enforced.

*Puget Sound Fin., L.L.C. v. Unisearch, Inc.*, 146 Wash. 2d 428, 441 (2002).  In the

present matter, the Service Agreement is two pages, the Terms and Conditions are

four pages, and all text discussing the provisions included is a consistent, readable

size, offset by bolded headings.  ECF No. 12-1 at 4–9.  RP On-Site updated its

Terms of Service and Privacy Policy in 2019, but the disclaimer surrounding

"Limitations on document generation," looks nearly identical to the warranty

disclaimer in the original contract.  *Compare* ECF No. 12-2 at 3 *with* 12-1 at 4–5.

And finally, the initial Service Agreement was signed by a representative of Coast.

ECF No. 12-1 at 5.  In sum, there is no indication that there was any unfair surprise

surrounding the creation of the contract.

A. Conspicuousness of the Clause

Whether or not the at issue terms are noticeable and whether or not they

exist in a maze of fine print are functionally the same for the purposes of this

analysis.  *Schroeder*, 96 Wash.2d at 260; *Am. Nursery*, 115 Wash.2d at 222.  As

stated above, the Service Agreement and the terms and conditions are all legible

and are relatively short.  ECF No. 12-1.  The relevant sections are offset with bold

headers and include: Indemnification, Disclaimer of Warranties, Limitation of

liabilities, and Additional indemnifications and limitations.  *Id.* at 4,5, and 8.  The

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE
PLEADINGS ~ 14

1   relevant provisions are therefore conspicuous.

2         B. <u>The Presence or Absence of Negotiation</u>

3         Similarly, the Court considers together the negotiation for the contract, the

4   manner in which the parties entered into the contract, and whether the parties had a

5   reasonable understanding of the terms. *Schroeder*, 96 Wash.2d at 260; *Am.*

6   *Nursery*, 115 Wash.2d at 223. There is little information about the formation of

7   the Service Agreement in November 2013. RealPage and RP On-Site maintain

8   that negotiations were conducted at arm's length by two sophisticated parties. ECF

9   Nos. 12 at 7 and 17 at 10. Coast discusses the substance of the Service Agreement,

10  but does not address the negotiations that took place to achieve the contract. ECF

11  No. 13 at 17. Notably, as discussed above, the exculpatory clause is plainly

12  spelled out and states explicitly the terms in which the parties are contracting

13  under. *Berg v. Stromme*, 79 Wash.2d 184, 196 (1971). Taking all facts in the light

14  most favorable to Coast, these grouping of factors weigh neutrally as little

15  information exists on the record to make a determination regarding whether parties

16  bargained for the at issue clauses or understood the specifics of the terms agreed to,

17  but notes that both entities appear to be sophisticated businesses with the ability to

18  read and understand the at issue provisions.

19        C. <u>Custom or Trade Usage</u>

20        The Court in *American Nursery*, recognized that "the party defending [a

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE
PLEADINGS ~ 15

1  limitation of liability clause] may prove the clause is conscionable regardless of the

2  surrounding circumstances if the general commercial setting indicates a prior

3  course of dealing or reasonable usage of trade as to the exclusionary clause."  115

4  Wash.2d at 223 (internal citations omitted).  There is no information in the record

5  discussing whether the exculpatory clause is industry standard, or if any official

6  source permits that tenant screening services may limit exposure to liability based

7  on the quality of the reports provided to landlords.  As such, this factor weighs

8  neutrally for want of further information.

9      D. <u>Course of Dealing</u>

10     Ultimately, Coast relied on RP On-Site's services providing tenant screening

11  for a decade before it discovered that the information provided may be deficient,

12  and therefore brought to light the issue of the exculpatory clauses.  Given the usage

13  of services from RP On-Site without incident, the Court finds this factor weighs in

14  favor of upholding the provisions.

15     The Court finds that the contract as a whole and specific terms therein are

16  not unconscionable as a matter of law.  However, the inquiry does not end there.

17  Provisions of a contract that limit a party's liability for negligence may nonetheless

18  be unenforceable as a matter of public policy.  *Wagenblast v. Odessa Sch. Dist. No.*

19  *105-157-166J*, 110 Wash. 2d 845, 848 (1988) (citation omitted).  Washington has

20  recognized historical categories of entities that are unable to disclaim liability

because they are charged with a public duty: a common carrier, an innkeeper, a professional bailee, a public utility, "or the like." *Id.* at 849–50.  Outside of these historic settings, Washington employs a nonexclusive six factor test to determine whether the exculpatory clause violates public policy:

> [An] invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Wagenblast*, at 851–52, 758 P.2d 968 (quoting *Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92, 98–101, 383 P.2d 441, 32 Cal.Rptr. 33, 6 A.L.R.3d 693 (1963)).

For example, employers may not require an employee to release liability against the employer for job-related injuries that are caused by the employer's negligence, banks may not contract away claims of negligence for safety deposit boxes rented out, public schools cannot release negligence liability for

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS ~ 17

interscholastic sports, *Wagenblast* at 856, and landlords may not rely on

exculpatory clauses for the condition of common areas in a multi-family dwelling

complex, *Reeder v. Western Gas & Power Co.*, 42 Wash.2d 542 (1953).  More

recently, courts have held that escrow agreements cannot contain exculpatory

clauses, *Chi Chen v. U.S. Bank Nat'l Ass'n*, 507 F. Supp. 3d 1254, 1261 (W.D.

Wash. 2020), nor may medical research studies involving human subjects

*Vodopest v. MacGregor*, 128 Wn.2d 840, 861 (1996), or pre-employment physical

exams, *Eelbode v. Chec Med. Ctrs.*, *Inc.*, 97 Wn. App. 462, 472 (1999).

In operationalizing the six-factor test articulated in *Wagenblast,* the Court

finds that the Service Agreement does not violate public policy.  As to factor one

and two, the creation and distribution of credit reports related to screening of

prospective tenants for residential property is heavily regulated, and effects

members of the public seeking to rent a residential property from a landlord that

requires such reports.  *See* 15 U.S.C. § 1681a; Wash. Rev. Code § 19.182.030;

Wash. Rev. Code § 59.18.257.  Relevant to this dispute, landlords are required to

provide an adverse action notice to prospective tenants, which must contain

specific, uniform terms, including the information received in a consumer report

and contact information for the reporting agency.  Wash. Rev. Code Ann.

§ 59.18.257.  A note to RCW 59.18.527 states that:

> The legislature finds that residential landlords frequently use tenant
> screening reports in evaluating and selecting tenants for their rental

properties. These tenant screening reports purchased from tenant screening companies may contain misleading, incomplete, or inaccurate information, such as information relating to eviction or other court records. It is challenging for tenants to dispute errors until after they apply for housing and are turned down, at which point lodging disputes are seldom worthwhile.

This statement suggests that the Legislature intended to shift to landlords the duty to disclose the consumer reporting agency, and that it preemptively acknowledged that there would be incorrect reports received from screening services. *See Shields v. Sta-Fit, Inc.*, 79 Wash. App. 584, 588 (1995) ("[The Health Studio Service Act] does not, however, impose safety regulations or require that employees be licensed or even well-trained. Nor does it authorize any administrative agency to regulate the health club industry."). As such, factors one and two weigh against a finding a violation of public policy, as it appears the Legislature recognizes that such reports may be unreliable in many instances. Affected members of the public applying for residential rental properties are to receive from landlords the reporting agency's information on a notice of adverse action.

The Legislature's finding melds into the third factor, because RP On-Site and RealPage have no direct relationship with a prospective tenant for the purposes of this dispute. Coast contracted with RP On-Site to perform tenant screenings, and members of the public apply for Coast properties on the RP On-Site service.

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS ~ 19

But, the contact between consumers and RP On-site is manufactured through the private agreement between Coast and RP On-Site, two business entities, rather than contracting directly with consumers.

Further, there is no suggestion that members of the general public have any unequal bargaining power with RP On-Site, because again, the contractual relationship is ultimately between RP On-Site and Coast. In this sense, the "public" would be other property management entities and landlords, who are seemingly in a position to contract with other screening service providers if they find the terms of the RP On-Site service disagreeable.

The record is not complete with respect to whether the Service Agreement was an adhesion contract, offered on a take it or leave it basis. *Zuver v. Airtouch Commc'ns, Inc*., 153 Wash. 2d 293, 305 (2004). However, the inquiry into an adhesion contract is centered around whether there was unequal bargaining power and a lack of choice. *Id*. at 305–06 (quoting *Schroder*, 86 Wash.2d at 260). Again, Coast is seemingly a sophisticated entity, and the First Amended Complaint and briefing material do not discuss whether other options for consumer report providers exists.

Finally, there does appear to be an element of control exerted by RP On-Site onto Coast, given the reliance landlord's place on such reports when making decisions on prospective tenants. However, holding one factor in favor of Coast is

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE
PLEADINGS ~ 20

1    insufficient to make a finding of a violation of public policy. *Wagenblast*, 110

2    Wash. 2d at 852 (1988) ("Obviously, the more of the foregoing six characteristics

3    that appear in a given exculpatory agreement case, the more likely the agreement is

4    to be declared invalid on public policy grounds.").

5        Coast asserts that even if the Court finds the relevant provisions of the

6    Service Agreement enforceable, it may nevertheless hold RealPage, RP On-Site's

7    parent company, liable by piercing the corporate veil as a non-signatory to the

8    agreement. ECF No. 13 at 13–14. RealPage argues that Coast has not pled a

9    theory of veil piercing in the First Amended Complaint, and even if it had, it does

10   not present enough evidence in Response to demonstrate that such measure is

11   warranted. ECF No. 12 at 11–12. However, in finding that the agreement is

12   enforceable, the Court finds that Coast likewise agreed to hold RP On-Site and its

13   parent harmless for "any and all liability, loss, claims, demands, damages or costs

14   of any kind, including reasonable attorneys' fees and costs of litigation, resulting

15   from the use of the Services . . ." ECF No. 12-1 at 4. Therefore, engaging in

16   corporate veil piercing is unnecessary.

17       In sum, the Court does not find the provisions of the Service Agreement

18   unconscionable or in violation of public policy, and therefore uses them in

19   enforcement against Coast. As such, Coast's third-party claims against RealPage

20   and RP On-Site are dismissed because there is no possibility of finding either

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE
PLEADINGS ~ 21

entity liable to Coast given the terms of the contract.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendants' Real Page, Inc. and RP On-Site LLC Motion for Judgment on the Pleadings (ECF No. 12) is **GRANTED**.

2. Plaintiffs' claims are **DISMISSED with prejudice**.

The District Court Executive is directed to enter this Order and Judgment accordingly, furnish copies to counsel, and **CLOSE** the file.

DATED October 4, 2024.



THOMAS O. RICE
United States District Judge

ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS ~ 22